IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2010

**ARLIE RAY THOMAS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Putnam County**
**No. 02-0786      Leon Burns, Judge**

**No. M2009-01523-CCA-R3-PC - Filed February 24, 2011**

Petitioner, Arlie Ray Thomas, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of trial counsel because counsel failed to challenge the affidavits supporting the arrest and search warrants, and that counsel failed to properly interview a witness. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Bryant C. Dunaway, Cookeville, Tennessee, for the appellant, Arlie Ray Thomas.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randy York, District Attorney General; and Beth Willis, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Background**

Following a jury trial, Petitioner was convicted of first degree premeditated murder and sentenced to life in prison. On appeal, this Court affirmed the conviction. *State v. Arlie Thomas*, No. M2004-01538-CCA-R3-CD, 2006 WL 1446842 (Tenn. Crim. App. May 22, 2006) *perm. app. denied* (Tenn., Aug. 28, 2006). The facts surrounding Petitioner's convictions were summarized by this Court on direct appeal as follows:

At the Defendant's trial, the following evidence was presented: Special Agent Bob Krofssik, of the Tennessee Bureau of Investigation ("T.B.I."), testified that, on January 22, 2000, he was contacted by the Putnam County Sheriff's Department to assist in an investigation. He said that on the following day he executed a search warrant for an older model mobile home on 6009 Burgess Falls Road, where the Defendant lived. Specifically, the warrant allowed him to interview the Defendant and search for the body of Mary Thomas, the Defendant's wife, as well as any evidence that would reveal how she died. Agent Krofssik explained that, while interviewing the Defendant, the Defendant mentioned that he had Mary Thomas's wedding and engagement ring in a brown bag in his pocket. According to Agent Krofssik, the Defendant told him that when the Defendant returned home from work on Friday, January 21, 2000, the rings were on the counter in his home. The Agent testified that the Defendant told him that the victim was in the process of moving out of their home, but the day before her disappearance they had a conversation and she agreed to stay. The Defendant then told Agent Krofssik that, on the evening prior to the victim's disappearance, they went to a party at the Defendant's cousin's house. The Defendant then stated that he went to work the next morning, and when he returned home the rings were on the counter, the victim was gone, and he has not seen her since.

Agent Krofssik stated that, on September 12, 2002, he went back to the Defendant's property to execute another search warrant and an arrest warrant for the Defendant. He then testified that the Defendant was arrested and brought back to the Sheriff's Department, where the Defendant gave the following written statement:

> Mary and I had agreed on how we were going to try and str[a]ighten out our li[v]es. [W]e [b]oth agreed we loved one another and were happy.
>
> On [T]hursday morning we went to the liquor store[,] bought whiskey[.][W]hen we got back we found out the law had been there[.][W]e called the law. Linda Dilldine came out [and] talked to me and Mary. Everything was [oaky] (sic).
>
> That night we went to the Norton[']s[.] I didn't drink but maybe [one][b]eer. Mary and everyone else drank whiskey. Later that [n]ight when we went home she got violent, cursing me[,] threw

her rings down[,] then she grab[b]ed a knife and s[w]ung at me [two] or [three] times[.]

I s[w]ung at her with my fis[t] trying to stop her[.]  She jerked her head [b]ack and I hit her throat[.]  I didn't mean to hit her there[,][b]ut I did.  I tried what I could to save her[,][b]ut no use.

I s[a]t there all night[,] g[o]t a barrel and put her in it[.]  Later [,] Friday morning[,] Ross [c]ame over to get me to go to work[.]  I went to work and then to the [N]orton['[]s be[ ]fore going home.  [I] didn't say [any]thing to any[ ]one about Mary.

 Roger c[a]me [b]y Saturday[.]  I asked for help.  [The] Law came Sunday[.]  I didn't know what to do so I[l]ied.

I hid the barrel behi[ ]nd the trail[e]r[.]  [The] Law didn't find it[.]

I still [have] it.

Agent Krofssik testified that thirty-one months passed between the date of his initial questioning of the Defendant and the date of the signed confession. Agent Krofssik said that a barrel with a body, later identified as the victim, was subsequently found on the Defendant's property.

On cross-examination, Agent Krofssik testified that he had taken statements from many people with information pertinent to his investigation and that he had written these statements out himself and had each declarant read and then sign their statement.  When questioned about a statement made by Robert Williams, Agent Krofssik could not recall if Williams was illiterate or had requested permission for his wife to be present while giving his statement.

Agent Krofssik agreed that, from the time of the Defendant's confession, the Defendant was cooperative, non-threatening, and seemed genuinely concerned about the victim's body.  He further testified that, although he was present on the Defendant's property when the barrel containing the victim's body was discovered and that he was present in the Medical Examiner's Office when the barrel was opened, he merely followed the vehicle containing the barrel to the Medical Examiner's Office and never witnessed the contents of the barrel at the Defendant's property.  Agent Krofssik testified that he was not aware of

any identifying marks or numbers that were put on the barrel before it was taken to the Medical Examiner's Office, however, he was insistent that the barrel from the Defendant's property was the same barrel opened at the Medical Examiner's Office.

On re-direct examination, Agent Krofssik testified that blood was found underneath a rug that had been stapled down to the floor in the Defendant's trailer. According to the agent's testimony, there was a layer of mud over the blood, and the Defendant told him the blood was dog's blood. On re-cross examination, Agent Krofssik agreed that no test had shown that the blood in the Defendant's home was human blood and that even if it were human blood, that would be consistent with the Defendant's tape recorded confession stating that some blood came from the victim's mouth.

Tommy Manier testified that he had know [sic] the victim since 1995, and she had moved in with him in January of 1996. He said that she stayed with him for several months and that they had a romantic relationship. He stated that the two had remained close until her disappearance and described himself as "a good close friend" of the victim. Manier said that in the weeks prior to the victim's death he had been sending friends over to check on her and agreed that this was done because he had concerns for her. He stated that two days prior to the victim's disappearance she had come over to his house and brought her clothes and a few other items and left them. Manier testified that about two weeks prior to the victim's death the Defendant came to his home looking for the victim and told Manier to tell the victim that she had one hour to get home or he would take "another course of action," and she would know what the Defendant was talking about.

On cross examination, Manier stated that when the victim moved out of his home in the late summer or early fall of 1996, she moved in with the Defendant. He said that he maintained sporadic contact with the victim from 1997 through 1999, but he did not have sexual relations with her. He stated that the victim moved in with him for a second time in January of 2000, but the relationship remained plutonic. Manier testified that he stopped on the Defendant's property to talk with the victim from time to time, however, he said that he only did so because he often had to drive down their street and would see the victim in the front yard. He again denied that he was having any sexual relations with the victim before her death.

Vickie Holliman testified that she was "[b]est of friends," with the victim. One evening, about one week prior to the victim's disappearance, Holliman and the victim had gone to Walmart. Upon returning from Walmart, Holliman helped the victim bring some items into the trailer where she lived with the Defendant. Holliman said that, when they entered the trailer, the Defendant was "waiving" a gun and told Holliman that if he found out that Holliman had been taking the victim to see Manier he was "going to kill every[ ]one of [them]." Holliman said that the Defendant had made similar statements two or three times in the weeks leading up to the victim's death and that the Defendant referred to the victim as "bitch [and] whore." The day that the victim was killed, Holliman and the victim drove past the Defendant on the road, but did not stop. Later that day the victim requested Holliman take her to the Defendant's residence. Holliman told her she did not want to take the victim to the Defendant's because she was "afraid something might happen" to her. Holliman took the victim to the Defendant's anyway, and the victim and Defendant got into an argument. During this argument, the Defendant was calling the victim names and "jerked her by the arm."

On cross-examination, Holliman stated that she did not believe that there was any kind of romantic relationship between Manier and the victim in the time leading up to the victim's death.

Roger Fisher testified that two days after the victim was murdered, January 22, 2000, the Defendant called Fisher to his home and told Fisher that he and the victim had been in an argument, and he had let things go too far and had hid her in a barrel. The Defendant asked Fisher for help in disposing the [sic] of the body and asked if Fisher could get a boat so that they could take the victim to Cane Hollow, a remote area with no developments. Inside the Defendant's trailer there was an area stained with blood with a smear of mud over it. The Defendant told Fisher that it was dog's blood. There was no rug covering the stained area. The Defendant also told Fisher that he did not like Manier. Two or three hours later, Fisher reported the conversation to the police. Fisher said that he was not offered anything in exchange for his testimony and did not feel threatened or have words put in his mouth by the detective who interviewed him. The day following Fisher's statement to the police, he was recalled to the Sheriff's Department and asked to confront the Defendant, which he stated was not easy to do. He said "tell them where she is," and the Defendant responded by saying "[w]hy are you doing this to me?"

On cross-examination, Fisher testified that he could not remember seeing a rug in the Defendant's house, but he conceded that he may have previously stated that there was a throw rug somewhere in the house. Fisher had drank seven or eight beers by the time he got down to the Sheriff's Department to make his statement on January 22, and when asked if he was intoxicated, he replied "[b]y law standard[s], yes." Fisher would not agree with the suggestion that the number of beers he drank that day had an effect on his memory of the events. Fisher could not testify as to what happened between the Defendant and the victim the day of the murder because the Defendant never explained exactly what transpired. Fisher said that he was never told he could be facing charges as an accessory to murder and was offered no help with a recent DUI arrest in exchange for his testimony. Fisher also stated that he does not own a boat. On re-direct examination, Fisher stated that he has several family members who own boats and that he could borrow those boats at anytime.

Anthony Thomas, the Defendant's son and the victim's stepson, testified that he was interviewed by Agent Krofssik while in jail, and he received no special arrangement in exchange for his testimony. Thomas came forward with information pertinent to the case by his own volition because he was coming off of methamphetamine and wanted to begin moving on with his life by putting the incident in question behind him. Around a week after the victim was murdered, the Defendant showed up at Thomas's house. This was the first time that the Defendant had ever been to Thomas's house. The Defendant told Thomas that the Defendant and the victim were drunk and got into a fight. The victim told the Defendant that she was leaving him, and the Defendant said that she was not going to leave him. The victim said "by God, I'll leave," and she pulled a knife. The Defendant attempted to defend himself and hit the victim in the throat. The victim fell to the floor where she lay gasping for breath. The Defendant was holding the victim and telling her to wake up. She was not responding, and was "gargling." Thomas testified that the Defendant did not want her to suffer anymore, so he "[c]hoked her the rest of the way out."

Thomas attempted to help the Defendant by buying him some canned goods and night vision goggles and dropping him off in the woods. On another occasion, a man named Robert Williams picked Thomas up at work and told him that he needed to go with Williams to the Defendant's house. Williams and Thomas went into the trailer and retrieved a bag full of money and clothes. Thomas stated that Williams got the money by pawning a tractor, and Thomas believed there was a couple hundred dollars in the bag. Thomas was told by Williams not to say anything to anyone and to take the bag back to work with

him. After work, Thomas was to take the bag to the Defendant in the woods, but the Defendant was not there, however, Thomas eventually was able to locate him.

Thomas stated that in the past he had told Agent Krofssik things that were not true, but he said that this was not because he did not know what happened. Thomas agreed that he waited more than two years to come forward with his information. He stated that he finally came forward because the victim's family kept asking when she was going to come back, and they were in great distress. He also felt that the Defendant was very remorseful and that had some impact on Thomas's desire to come forward.

On cross-examination Thomas admitted that he had been a methamphetamine user at different points in his life. He stated that he relapsed into drug use after learning that his father had killed Mary Thomas. His drug use made him paranoid and brought on hallucinations. Thomas denied that Williams ever showed him the barrel or the corpse inside the barrel, however, he admitted that he had made a statement to Agent Krofssik that such an occurrence did take place. Thomas claimed that he had lied to Agent Krofssik but had only done so to protect the Defendant. On re-direct examination, Thomas testified that when the Defendant told him about the murder, Thomas had been off of drugs for three years.

Richard Farley, the victim's son, testified that he had a DNA test administered to him in order to facilitate identification of the victim's body. He had not seen the victim in eight or nine years prior to her disappearance.

Mary Michelle Beech testified that she is the victim's daughter and gave a DNA sample to be used to help positively identify the victim's body. She had not seen the victim in ten or eleven years.

Camilla Denise Leverette testified as an expert witness that she works at Orchid Cellmark in Nashville, which is a DNA testing laboratory. She took DNA samples from a femur and two molars taken from the body in the barrel discovered on the Defendant's property and compared the DNA patterns with those taken from Richard Farley and Mary Michelle Beech. This was done to determine if the body in the barrel was that of Mary Thomas. There was a 98.7% probability that the body in the barrel was Richard Farley's mother, and a 99.6% probability that the body in the barrel was Mary Michelle Beech's mother. Leverette stated that those were "very good numbers." Leverette also

testified that when the two numbers were looked at in conjunction, they were an even stronger indicator of maternity.

Doctor Amy McMaster, who works for the Medical Examiner's Office in Nashville, testified that on September 13, 2002, she performed an autopsy on the body of Mary Thomas. The autopsy report included the following:

> The decomposed intact remains of a white female and recovered from within the barrel. The decedent is dressed in a black leather jacket, heavy sweater, pants (possibly denim jeans), socks, panties, bra, and white leather athletic shoes. A piece of duct tape was found on the front of the sweater.
>
> Evidence of injury includes fractures of the right and left horns of the thyroid cartilage and fractures of the hyoid bone. These fractures are indicative of strangulation with compression of both sides of the neck.
>
> The advanced decomposition precludes determination of additional injuries on the skin and neck muscles.
>
> In summary, the cause of death is strangulation. The manner of death is homicide.

The victim's body was in advanced putrefactive decomposition with diphtheria and the hands were partially mummified, which would be consistent with a body that had been in a barrel for more than two years. The body weighed one hundred and four and one half pounds. Dr. McMaster opined that the weight of the corpse was probably the same as the weight of the body prior to death, and that in some phases of decomposition, a body "may gain a little bit of water weight or weight due to insect activity or it may lose weight due to ... dehydration." It was Dr. McMaster's opinion that although it was possible to strangle someone without leaving marks on the neck or breaking bones, the injuries suffered by the victim in this case were affirmative indicia of strangulation. Furthermore, the possibility that the victim suffered her injuries by being hit in the neck, open-handed, were "minimal .... less than one percent." When questioned about whether a boxer is likely to suffer from these types of injuries, the doctor said that she would not expect to see such injuries as the result of a boxing match.

Dr. McMaster next testified about the subtleties of strangulation. She stated that when someone is strangled, they die because blood cannot flow to and from their brain and that strangulation does not kill a person by keeping them from breathing. She testified that the time it would take to kill someone in this fashion is highly variable, depending on how hard the victim was struggling, but in general she estimated it would take ten to fifteen seconds to bring someone to a state of unconsciousness. However, she said that if the pressure applied to the neck was released once the victim fell unconscious, no permanent damage would be suffered, and the victim would likely regain consciousness in time. To kill the victim would require the attacker to keep the pressure applied to the neck for an additional thirty to sixty seconds, although, again, these numbers may vary from case to case. Dr. McMaster said she did not believe there was any possibility that the victim's body in this case sustained the injuries associated with strangulation when she was placed in the barrel.

On cross-examination, Dr. McMaster testified that she was not given any information from the TBI regarding how the victim may have been killed. She stated that it was not possible to tell if the victim was strangled manually with someone's hands or with a ligature, such as a length of cord. An x-ray revealed that, aside from the fractures in the neck, there where no other broken bones in the body. Dr. McMaster stated that although age can have some impact on the amount of force necessary to break bone, in this case, the victim's age was not relevant. The doctor was not familiar with any cases where the hyoid bone was broken from something other than strangulation. Additionally, the doctor was not familiar with any cases were the thyroid cartilage or hyoid bone were broken during the autopsy. Dr. McMaster conceded that it was possible to break the hyoid bone with a blow from below, but that a blow from below could not break the thyroid cartilage. She also indicated that it was possible to break the hyoid bone in a high-speed auto accident, but the thyroid cartilage would not be broken in such a case. When questioned further on this subject the doctor stated that, although "anything is possible," it was not consistent with her knowledge on the subject and it was not probable.

Dr. McMaster agreed that it was possible that alcohol may have some impact on the time it would take a person to become unconscious or die from strangulation and that it was possible that alcohol could hasten the process.

The trial court then read to the doctor some questions from the jury. In response to these questions, Dr. McMaster testified that she believed that a very forceful blow to the neck with a closed fist or with an instrument could cause spasms, but not the type of injuries that the victim in this case sustained. She next stated that, although it was possible to have some bleeding from the mouth based upon a blow to the neck, she would not expect there to be much blood from such a blow and that bleeding from the mouth is more likely to be caused by a blow to the mouth. However, she admitted that it was conceivable that a blow to the neck could cause the teeth to clamp down on the tongue, which could produce bleeding. She stated that it was possible for thyroid cartilage to decay to the point were damage could not be detected, but in this case that had not happened.

Jerry Norton, the Defendant's cousin, testified that the Defendant and the victim were at Norton's house the evening of the murder for approximately two to three hours. The Defendant and victim both came and left together. The victim was in "good spirits ... laughing [and] having a good time." The Defendant drank four or five beers and was slightly intoxicated, but not drunk. The victim had more to drink than the Defendant and was drinking liquor as well. She was "fairly well intoxicated."

On cross-examination, Norton testified that the victim was not a "mean" drunk, that she was always a pleasant person to be around, and that she always treated the Defendant well. The night before the murder, the victim and the Defendant were over at Norton's house because they were celebrating that they had reconciled. On Friday, January 21, 2000, the Defendant returned to Norton's around 11:00 a.m. and asked Norton to cut some lumber for him, so he could build some kitchen cabinets for the victim. The Defendant acted normal and did not ask for help hiding a barrel or for use of Norton's boat. Norton had never seen the Defendant mistreat the victim.

*State v. Arlie Thomas*, 2006 WL 1446842, at *1-7.

## II. Post-Conviction Hearing

Robert Williams testified that he has known Petitioner for more than twenty years. Mr. Williams said that he had an eleventh-grade education and was able to write his name and read "stop signs," but other than that, he was illiterate.

Mr. Williams testified that he was interviewed before Defendant's trial at the sheriff's office by Agent Bob Krofssik of the Tennessee Bureau of Investigation (TBI). He told Agent Krofssik that he was unable to read or write and requested that his wife be present if he needed to give a statement because his wife helped him with "documents." Mr. Williams claimed that Agent Krofssik told him that his wife did not need to be present and that Agent Krofssik would write out what Mr. Williams said. He then gave a statement to Agent Krofssik and signed the written statement.

Mr. Williams testified that he was later interviewed in the front yard of his home by Petitioner's attorney, Ricky Jenkins. Mr. Williams' wife was also present, and he told Mr. Jenkins that he could not read or write. Mr. Williams testified that Mr Jenkins was there for ten to twenty minutes and did not show him the written statement taken by Agent Krofssik or read it to him line by line.

Mr. Williams claimed that several things in the written statement were not accurate. He agreed that he told Agent Krofssik that Petitioner admitted to killing the victim, but it was an accident. However, Mr. Williams testified that Petitioner did not tell him that he hit the victim in the throat and choked her to death as was reflected in the statement. Concerning other portions of the statement, the following exchange took place between post-conviction counsel and Mr. Williams:

Q. On the second page of the typewritten statement, about half way down in the first paragraph, I'm reading, "I told Tony what his daddy told me about killing Mary." Did you say that?

A. No.

Q. You never told Agent [Krofssik] that statement?

A. No.

Q. In the next paragraph, on page 2, I'm reading, "He told me, if the police can't find her body or a murder weapon, they could never prosecute him." Did Arlie Thomas ever tell you that?

A. No.

Q. Did you tell Agent [Krofssik] that Arlie Thomas ever said that?

A. No, sir.

-11-

Q. The last sentence of that paragraph on page 2 I'm reading, "I already know what he wanted to happen to Roger Fisher, and I didn't want anything to happen to me or my family." Did Arlie Thomas say that to you?

A. No, sir.

Q. Did you tell Agent [Krofssik] that he said that?

A. No, sir.

Q. And further, in the last paragraph, it states, "I just remember that a few months after Arlie first came to my house and told me what happened, we did a tree job together in White County." Did you ever tell that to Agent [Krofssik]?

A. No, sir.

Q. In fact, did you ever work with Arlie Thomas after the disappearance of Mary, the victim in this case?

A. No, sir.

Q. Further down in that last paragraph, it says, "Arlie pointed to a pine tree about 75 to 100 feet from his trailer." Did Arlie ever point out a pine tree or a location?

A. No, sir.

Q. Did you ever tell Agent [Krofssik] that Arlie did that?

A. No, sir.

On cross-examination, Mr. Williams testified that he was able to read his name, his address on Neal Street, and the word "Cookeville" that appeared on his written statement, but he was unable to read anything else. Mr. Williams acknowledged that his initials appeared many times on every page of the statement because Agent Krofssik "said he had to change the words, so he had to have me initial it." He claimed that Agent Kroffsik did not review every sentence with him verbatim and have him initial it, and he had no idea what he was initialing.

-12-

Mr. Williams testified that Mr. Jenkins did not specifically ask him if Petitioner told him that Petitioner choked the victim, and he denied walking away from Mr. Jenkins when he asked the question. He claimed that he fully cooperated with the interview, and he denied telling Mr. Jenkins that he did not want to testify at trial. Mr. Williams testified that he had cancer at the time of Petitioner's trial.

Petitioner testified that the affidavit in support of the arrest warrant in his case, dated September 11, 2002, was erroneous because Agent Krofssik made reference to what appeared to be red blood stains on the kitchen floor. However, the copies of the laboratory reports received from the Tennessee Bureau of Investigation (TBI), dated January 26, 2000, and February 4, 2000, concerning floor samples, failed to find "the presence of blood." Petitioner testified that the affidavit in support of the search warrant also referenced blood stains on the floor. He felt that the statements were placed in the affidavits to "deceive the Court, and for no other apparent reason, because if you've got test stains, test results, saying that these are nothing, then you should not put them in." Petitioner testified that although trial counsel filed "bunches and bunches" of motion on his behalf, they did not discuss the issue of blood stain references in the affidavits, and trial counsel did not file a motion to challenge the affidavits. Petitioner also felt that trial counsel should have challenged the identity and statements made by Roger Fisher in the affidavit supporting the arrest warrant.

On cross-examination, Petitioner acknowledged that he confessed to killing the victim. He also admitted that he sent a letter to trial counsel on April 3, 2006, the day after his trial, offering an apology to trial counsel. The letter also stated: "I'm proud of the way you handled my case. I believe your around [sic] work - - your ground work and motions in pre-trial preparation was great effort on your part and your secretary." Petitioner testified that trial counsel visited him many times at the jail, and filed at least thirteen motions on his behalf. He acknowledged that trial counsel sent him a letter indicating that trial counsel interviewed Mr. Williams. Petitioner did not recall if he and trial counsel discussed whether Mr. Williams would make a good witness. He denied telling trial counsel that Mr. Williams was a "liar and a snitch" and that Mr. Williams would not show up for trial because he had cancer. Petitioner testified that Mr. Williams was "there for jury voir dire each time until the D.A. turned him loose and told him to leave." He acknowledged that trial counsel filed a motion attacking the search warrant on the issue of consent.

Trial counsel testified that prior to trial, he was aware that Mr. Williams was illiterate because they discussed the issue when he interviewed Mr. Williams. During the interview, he showed Mr. Williams the statement given to Agent Krofssik, and Mr. Williams acknowledged that it was the statement that he had signed. Concerning the interview, trial counsel said:

He told me - - as a matter of fact, I went into that - - and let me say that I was interviewing him because he was listed as a witness for the State. And Mr. Thomas and I were both hoping that he would not come and testify for the State, because of the things that he had made - - statements he had made in that statement. I was there from the perspective that I wanted to see what he had to say for cross-examination purposes.

So I started to ask him about the background of that statement, that he had gave it, and if he could read and write and so forth.

Trial counsel testified he asked Mr. Williams about the background of the statement, "his abilities and so forth, and how the statement was done, and he said that this agent, TBI agent, had read it to him and had wrote it out for him because he couldn't read and write." Mr. Williams acknowledged that he told Agent Krofssik that Petitioner said he accidently killed the victim. When asked if Petitioner had told Mr. Williams that he choked the victim to death, Mr. Williams could not recall, and he ended the interview by walking into the house. Trial counsel testified that he did not return to Mr. Williams' house to ask about other portions of the statement because "[i]t didn't seem to be a very friendly place to go after that." When asked if he considered using Mr. Williams as a witness at trial, counsel said:

I went back to meet with Arlie Thomas at the jail, and we discussed it, after I had been to see Robert Williams. And I had described to him, as I'm describing to you, what had transpired at Robert Williams' home, about how, "Yeah, he said it was an accident," but then he wouldn't tell me that he didn't say that he choked her to death, and these other things. And Mr. Thomas described - - because - - Robert Williams had - - the statement included, that Robert Williams said he had choked her to death. He said that Robert Williams was a snitch and a liar, and we didn't need him for nothing. And he and I both discussed the fact that we didn't want to call him, and Arlie Thomas agreed not to call him for no [sic] witness.

You see, there's no good part in here, because Robert Williams says in one place that it's an accident, but if I had called him as a witness, that would have been objected to by the State, because that is a self-serving hearsay statement that would not be admissible anyway. And if you put him on the witness stand and - - because I don't know what he's going to say, and I put him on there, I don't know if he's going to say that - - all he's got to do is say that Arlie told him he choked her to death, and the case if over. I mean, it's just over. Because it's based on whether or not this is an accident or whether this was an intentional killing.

Trial counsel testified that prior to trial, he was aware that samples from Petitioner's floor failed to reveal the presence of blood. He noted that the affidavits in support of the arrest warrant and search warrant did not allege that there were any human blood stains on the floor. "It simply says that he was at Arlie Thomas' home, and Arlie Thomas was trying to remove blood stains from the kitchen floor." Trial counsel also pointed out that the affidavits stated that the killing was based on strangulation, not a bleeding injury. Trial Counsel testified that he did not challenge the veracity of the statements contained in the affidavits because:

> To my knowledge, to this date, I would have had no proof whatsoever to rebut the fact that there was not - - that he was not trying to get blood stains off the floor. And that aff - - that aff - - those affidavits are so full of other, such other information that the search warrants are not really based on that. I would perhaps, if that was all it was based on, but it's not all it's based on. It doesn't say that it's blood.[sic] and I don't  - - I just didn't - - Arlie Thomas and I didn't see that it was relevant. And I discussed that with him also.

Trial counsel testified that Agent Krofssik was "just relating the whole story" by mentioning the stains. He also noted that it had also been stated that the blood was dog blood. In any event, trial counsel did not feel that there was any way to challenge the affidavits. Concerning Roger Fisher, trial counsel said:

> Well, you've mentioned several names that are not in the petition, so when I look through this file, look at the petition that Mr. Thomas and yourself have filed, and I have a box with every name that he ever gave me with a folder with the name of the witness on it, we looked at it - - we searched criminal records of every witness that the State was going to use, and all I could come upon - - and I remember this - - today, I didn't really look at Roger Fisher's file, because I didn't know about it, but the only thing that I could find that he had was traffic offenses that were not impeachable offenses for us to question him on.

On cross-examination, trial counsel testified that he and Petitioner discussed Mr. Williams, and it was Petitioner's decision not to call him as a witness. Additionally, trial counsel noted that at the end of trial, Petitioner "relayed that he was glad that we didn't call Robert Williams." Trial counsel testified that there was a full hearing concerning the search warrant and the arrest warrant on other grounds than the mention of blood stains in the affidavits. He also noted that even though officers had a search warrant, Petitioner consented to the search of his person and his property.

### III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo,* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S.Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn.1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id*. Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. In cases involving a guilty plea, the petitioner must show prejudice by demonstrating that, but for counsel's errors, he or she would not have pleaded guilty but would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

#### A. Failure to Challenge the Affidavits Supporting the Arrest and Search Warrants

Petitioner first argues that trial counsel was ineffective for failing to challenge the affidavits supporting the arrest and search warrants. He first asserts that the "veracity of Roger Fisher, the informant, is not properly addressed" in the affidavit of complaint

-16-

supporting the arrest warrant, "nor is it apparent whether he is a citizen informant or a criminal informant." The post-conviction court considered this issue and found that trial counsel was not ineffective. The court noted:

> Again, there were other grounds for the arrest. Mr. Thomas suggests that the statement of Mr. Fisher is incorrect and it should have been challenged, but Mr. Jenkins says that he didn't have any way to challenge him, didn't find any grounds to challenge him.

The record in this case does not preponderate against the post-conviction court's findings. Trial counsel testified that he searched the criminal records of every witness that the State intended to use, and he did not locate anything, other than traffic offenses, to use to impeach Mr. Fisher. Petitioner did not present any evidence at the post-conviction hearing to show that any statements made by Mr. Fisher were unreliable.

Petitioner next contends that trial counsel was ineffective for failing to challenge the affidavits because they allegedly contained false and misleading statements by Agent Krofssik that were intended to deceive the court. In the affidavit supporting the arrest warrant, Agent Krofssik stated that he observed "what appeared to be red stains on the kitchen floor under the carpet." There was also a reference to blood stains. In the affidavit supporting the search warrant, Agent Krofssik noted that "Arlie Thomas told Roger Fisher he thought there was blood on the floor of the trailer and rubbed dirt on the spots with his foot." Petitioner contends that Agent Krofssik included these references in the affidavits to intentionally deceive the court by inferring that the victim's blood was found in the residence even though he was aware that a TBI examination of a floor sample from Petitioner's residence, conducted two years earlier, "failed to reveal the presence of blood."

In considering this issue, the post-conviction court found that Agent Krofssik did not place the references in the affidavits "on purpose to infer that they were human blood stains. I don't find that to be the case, and did not find counsel was deficient in failing to challenge Mr. Krofssik's affidavit." Again, the record supports the post-conviction court's findings. Trial counsel did not feel that there was any way to challenge the affidavits in support of the arrest and search warrants. He noted that the affidavits did not allege that there were any human blood stains on the floor. "It simply says that [Roger Fisher] was at Arlie Thomas' home, and Arlie Thomas was trying to remove blood stains from the kitchen floor." Trial counsel also pointed out that the affidavits stated that the killing was based on strangulation, not a bleeding injury. Trial Counsel did not feel that he had any proof to "rebut the fact that there was not - - that he was not trying to get blood stains off the floor." Trial counsel further noted that the affidavits were full of other information to support the warrants. He also felt that Agent Krofssik was "just relating the whole story" by mentioning the stains.

We conclude that Petitioner has failed to show that trial counsel's assistance in this asserted ground fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance on this ground. Petitioner is not entitled to relief on this issue.

### B. Failure to Properly Interview Robert Williams

Finally, Petitioner contends that trial counsel was ineffective for failing to properly interview Robert Williams. He contends that if trial counsel had conducted a proper interview with Mr. Williams, he would have discovered that the hand written statement that Agent Krofssik took from Mr. Williams contained many inaccurate statements.

In considering this issue, the post-conviction court held: "As I recall, Mr. Jenkins attempted to go over the statements, and at some point Mr. Williams became resistant to the [sic] further interview and went in the house."

The record supports the trial court's findings. Trial counsel testified that he attempted to interview Mr. Williams and showed him the statement given to Agent Krofssik. He said that Mr. Williams acknowledged that it was the statement that he had signed. Trial counsel testified that he asked Mr. Williams about the background of the statement, "his abilities and so forth, and how the statement was done, and he said that this agent, TBI agent, had read it to him and had wrote it out for him because he couldn't read and write." Mr. Williams acknowledged that he told Agent Krofssik that Petitioner said he accidently killed the victim. When trial counsel asked if Petitioner had told Mr. Williams that he choked the victim to death, Mr. Williams could not recall, and he ended the interview by walking into the house. Trial counsel testified that he did not return to Mr. Williams' house to ask about other portions of the statement because "[i]t didn't seem to be a very friendly place to go after that." Trial counsel testified that he met with Petitioner and discussed whether to call Mr. Williams as a witness. He said that Petitioner called Mr. Williams a "snitch and a liar," and they agreed not to call Mr. Williams as a witness.

We conclude that Petitioner has failed to show that trial counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE